SIGNED THIS: May 3, 2012

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: | ) |
| | ) |
| MARK A. POLASCHEK and | )   No. 08-81311 |
| KARLA A. POLASCHEK, | ) |
|                 Debtors. | ) |
| | ) |
| AHMAD S. VOSSOUGHI and | ) |
| C,N, & A, INC., | ) |
|                 Plaintiffs, | ) |
| | ) |
| vs. | )   Adv. No. 08-8101 |
| | ) |
| MARK A. POLASCHEK, | ) |
|                 Defendant. | ) |

**O P I N I O N**

This matter is before the Court after trial on the Second Amended Complaint brought by Ahmad S. Vossoughi (VOSSOUGHI) and his wholly owned corporation, C,N, & A, Inc., against Mark A. Polaschek, the Debtor (DEBTOR), seeking a determination that the debt arising from the sale of his business to the DEBTOR is nondischargeable under sections 523(a)(2)(A) and (a)(6).[1]

---

[1] Karla Polaschek was dismissed as a Defendant by order entered August 27, 2009.

*Background*

  VOSSOUGHI, a native of Iran, came to the United States in 1963, when he was sixteen years old. Although he spoke no English on arrival, he graduated from high school in Missouri in 1965. He moved to the Quad Cities, got a job at McDonald's and attended Blackhawk College. VOSSOUGHI was hired by International Harvester, where he worked for nineteen and one-half years. During that time, he married and raised a family. In 1983, VOSSOUGHI invested the money he had saved in a gas station and convenience store known as the "Oasis" in Davenport, Iowa. In 1985, VOSSOUGHI incorporated and the business was operated through his wholly owned corporation, C,N, & A, Inc., an Iowa corporation. During the next twenty years, he worked long hours, improving the property and increasing the revenue from $500 to $700/day to $2,500 to $5,000/day.

  In 2006, the DEBTOR, one of VOSSOUGHI'S customers, inquired whether he was interested in selling the business. When VOSSOUGHI told the DEBTOR he was asking $400,000, the DEBTOR did not respond, but continued to come into the store, appearing to inspect the premises. In August, 2006, the DEBTOR told VOSSOUGHI that he wanted to buy the business. Satisfying himself that the DEBTOR had the ability to make the purchase, VOSSOUGHI eventually agreed to sell it to the DEBTOR for $275,000. VOSSOUGHI'S accountant advised him that he should not take the proceeds all at once because of tax consequences. VOSSOUGHI retained Michael Meloy, an attorney with whom he was acquainted. The DEBTOR'S brother, Joseph Polaschek, a Quad Cities lawyer, represented the DEBTOR in the purchase and sale transaction. Preclosing negotiations and an exchange of documents took place between the lawyers. The

transaction was consummated on September 15, 2006, at Joseph's law office. The closing was attended by VOSSOUGHI, Meloy, the DEBTOR and Joseph and lasted for several hours. The lengthy closing culminated in the execution of three separate, but interrelated, agreements, identified as the Real Estate Contract, Asset and Business Name Purchase Agreement (asset purchase agreement) and Noncompetition Agreement, all dated September 15, 2006. Each of the agreements refer to the other two. The purchase price for the sale was allocated as follows: $40,000 for the purchase of the real estate, $191,281.98 for the purchase of the assets and name of the business, and $70,000 for the noncompetition agreement.

Pursuant to the real estate contract, executed by the DEBTOR as President of PPM Properties, Inc. (PPM), a corporation wholly owned by the DEBTOR, VOSSOUGHI agreed to sell the real estate to PPM for the sum of $40,000. The contract provided for a down payment of $10,000 and the balance of the purchase price of $30,000 to be paid in monthly installments of $249.27, requiring 120 months or ten years of payments. Paragraph 26 of the real estate contract, captioned "Special Provisions," refers to an Addendum. The parties agree that they spent a significant portion of the closing negotiating and drafting the Addendum, a document that had not existed prior to the closing. Paragraph 1 of the Addendum purports to change the payment terms to require ten years of monthly payments of $249.27, plus an additional ten years of monthly payments of $258.32, which payments total $60,910.80. The amortization schedule attached to the Addendum erroneously totals the twenty years of payments as $30,998.40. This error was not acknowledged at trial by either party, much less explained. The real estate contract and the

3

Addendum, with respect to the purchase price, are irreconcilable. When PPM purchased the real estate, according to the HUD-1 settlement statement, it paid a contract balance of $29,816.57. It thus appears that the parties used the terms of the real estate contract to determine the payoff amount, ignoring the Addendum and the erroneous amortization schedule.

VOSSOUGHI testified that it was his intent that the real estate secure all of the buyer's obligations, including those under the asset purchase and noncompete agreements. He testified that he did not want to lose the real estate as collateral if the amount due under the real estate contract was paid off before the other obligations. Certain provisions in the Addendum evidence this intent. After providing the buyer a right to prepay the real estate contract, the Addendum provides in Paragraph 5 the following limitation:

> In the event Buyers sells, assigns or pays off this contract before the due date, Buyer shall remain responsible to re-convey the real property in the event there is any default on either the Non Competition Contract or on the Asset and Business Name Purchase Agreement.

Paragraph 6 of the Addendum further provides as follows:

> If Buyer elects to prepay under the terms of this real estate purchase contract, Seller shall convey the real property to Buyer subject to the full payment of said contract and expressly subject in the warranty deed for said conveyance stating that the Buyer is restricted and can sell said real estate only upon the full payment and completion of the terms of the Non-compete Agreement and the Asset Purchase Agreement.

The asset purchase agreement identified BVM Enterprises as the purchaser.[2] Under its terms, $1 was allocated to the goodwill of the business; $26,280.98 was allocated to the

---

[2] The DEBTOR signed the asset purchase agreement as manager of BVM Enterprises LLC. According to the DEBTOR'S petition, BVM Enterprises was an Illinois limited liability company. The records of the Illinois Secretary of State, however, do not show such a listing, but do disclose the DEBTOR as President of BVM Enterprises, Inc., a corporation which was involuntarily dissolved on January 9, 2009.

4

purchase of the inventory on the date of closing and was to be paid at the closing; $70,000 was allocated to the noncompete agreement, which was to be embodied in a separate agreement; and $165,000 was allocated to the remaining transferred assets, with $40,000 of the $165,000 to be paid at closing and the balance of $125,000 to be paid in monthly payments of $1,038.63 for ten years and an increased monthly payment of $1,091.64 for the following ten-year period.[3] The agreed allocation of the purchase price was recommended by VOSSOUGHI'S accountant so as to spread out his tax liability.

The noncompetition agreement, entered into with PPM, calls for monthly payments of $581.63 for ten years with increased payments of $602.75 for the following ten years.[4] Section 5(a) of the noncompetition agreement provides:

> (a)  If PPM fails to timely perform this contract or the land sale contract or the personal assets and business name contract, Vossoughi may forfeit all contract Agreements, and all payments made shall be forfeited or, at Vossoughi's option, upon thirty (30) days written notice of intention to accelerate the payment of the entire balance because of such failure (during which thirty (30) days such failure is not corrected). (sic)  Vossoughi may declare the entire balance immediately due and payable on all three contracts. Forfeiture of this Agreement shall also forfeit the land sale contract of the land and building as well as the personal assets and business name contract. PPM agrees to pay Vossoughi reasonable attorney fees in the event of forfeiture.

The real estate contract and the Addendum were recorded in the Office of the Recorder, Scott County, Iowa.  The DEBTOR personally guaranteed the obligations arising under the three agreements.

---

[3] The amortization schedule attached to the asset purchase agreement contains an error similar to the one in the schedule attached to the real estate contract.  It totals the twenty years of payments as $129,159.60.  The correct total is $255,632.40.

[4] The attached amortization schedule is also in error.  It totals the payments as $72,330.  The correct total is $142,125.60.

5

Following the sale of his business to the DEBTOR, VOSSOUGHI moved to California. Several months later, VOSSOUGHI'S attorney notified him that the DEBTOR wanted to pay off the real estate contract. VOSSOUGHI returned to the Quad Cities and though he elected not to retain Meloy to represent him at the closing of the early payoff, Meloy sent a letter to Joseph on January 12, 2007, advising him that VOSSOUGHI would only convey the property to the DEBTOR by a deed that restricted PPM from reselling it to a third party. VOSSOUGHI, without Meloy, met with the DEBTOR at his brother's law office. At that meeting, VOSSOUGHI executed a warranty deed, dated March 29, 2007, conveying the real estate to PPM.[5] The warranty deed was recorded on April 9, 2007. The deed contains no restriction on resale or otherwise. In conjunction with the purchase, the DEBTOR obtained a loan from American Bank and Trust Company for $184,000, granting it a mortgage in the real estate.

The DEBTOR continued to make the payments under the asset purchase agreement and the noncompetition agreement for nine or ten months, but the payments had stopped by February, 2008. When VOSSOUGHI contacted the DEBTOR, the DEBTOR told him to contact his attorney. In March, 2008, VOSSOUGHI brought suit against PPM Properties, Inc., BVM Enterprises, LLC and the DEBTOR in Scott County, Iowa. The American Bank and Trust Company foreclosed on the real property.

The DEBTOR and his spouse filed a joint voluntary petition under chapter 7 of the Bankruptcy Code on May 15, 2008. According to the Statement of Affairs, chapter 7 petitions were filed on behalf of some of the DEBTOR'S other business interests, including

---

[5] VOSSOUGHI received no proceeds from the transfer since the proceeds he would have received went to pay his mortgage to M & T, which the settlement statement shows was paid $34,951.69.

6

PPM. VOSSOUGHI and C,N, & A, Inc., were listed on Schedule F as the holders of an unsecured, non-priority claim in the amount of $216,000. Schedule F debts totaled $2,116,783.90. VOSSOUGHI filed the complaint initiating this adversary proceeding seeking a determination that his claim for damages arising under the asset purchase agreement and noncompetition agreement is excepted from discharge pursuant to section 523(a)(2) or, alternatively, section 523(a)(6). The matter was tried before the Court on December 1, 2011. VOSSOUGHI, the DEBTOR, and the DEBTOR'S brother, Joseph, testified at trial.

At the time of trial, VOSSOUGHI was sixty-six years old. VOSSOUGHI testified that he purchased the gas station in 1983 for $40,000. At that time, it was surrounded by empty factories and was heated by a coal stove. He worked long hours every day, making significant improvements to the property. VOSSOUGHI accused the DEBTOR of misrepresenting his financial status, although what he claims the DEBTOR told him turned out to be substantially true. He claims the DEBTOR told him that he was a stockbroker and had a seat on the exchange, that his wife was a doctor, and that his brother was an attorney. The DEBTOR stated that he owned Hunter's Restaurant, which earned $5,000 per month and he had a cigarette business in Davenport, which made $3,000 to $4,000 per month. VOSSOUGHI admitted that once they reached an agreement on a purchase price of $275,000, the DEBTOR offered to pay the full amount at closing. It was only for VOSSOUGHI'S benefit that the DEBTOR agreed to pay him over a period of years. Nevertheless, VOSSOUGHI admits that he did not request or obtain a written financial statement from the DEBTOR.

VOSSOUGHI testified that the two-page Addendum to the real estate contract was negotiated at the meeting between his attorney and the DEBTOR'S brother, and was intended to serve the important purpose of assuring that the real estate would secure the full amounts due under each of the three contracts. VOSSOUGHI opined that the value of the real estate at the time of the sale to the DEBTOR in 2006 was $400,000. The surrounding area in Davenport had been revitalized and the empty factories had been renovated into loft apartments. VOSSOUGHI testified that he did not have the funds to hire Meloy to represent him in the transfer of the real estate to the DEBTOR, but Meloy told him that the DEBTOR'S brother would take care of the paperwork. VOSSOUGHI testified that when he went to the law office, the deed was placed before him, along with other documents, and he was directed to sign it. VOSSOUGHI testified that he considered Joseph to be acting as his attorney, noting that he was presented with a bill for $500. VOSSOUGHI testified that when he requested copies of the documents, Joseph advised him that the deed was not complete and that an addendum needed to be added. VOSSOUGHI stated that he trusted Joseph to do the right thing. After the DEBTOR defaulted, VOSSOUGHI believed that he would get the real estate back.

Joseph testified that he has been practicing law since 1992, concentrating in real estate law, particularly in representing parties in acquisitions and sales. Joseph acknowledged that the purpose of the Addendum was to include the terms set forth therein as part of the real estate contract. While Joseph recalled greeting VOSSOUGHI on the day that he came to his office to sign the warranty deed conveying the property and

8

escorting him to the office of an administrative assistant, the actual execution of the deed was handled by that employee.

The DEBTOR testified that prior to his purchase of the Oasis, he told VOSSOUGHI that he intended to get a mortgage on the property. Though he admitted telling VOSSOUGHI at that time that he earned income as a stockbroker, he denied that he discussed the income earned from Hunter's Restaurant or the warehouse owned by PPM. The DEBTOR also denied telling VOSSOUGHI that his wife was a doctor (although she is) and that he could raise money by selling stock. The DEBTOR testified that when he purchased the Oasis the building was not up to Code and was in deplorable condition. After the purchase, the DEBTOR made significant improvements, removing the second floor, putting on a new roof and canopy, replacing the HVAC system and installing new beverage coolers. According to his testimony, when American Bank cut off his line of credit in late February, 2008, his businesses were making money and he had $75,000 on account at the Bank. The DEBTOR blames American Bank's rash and unexpected termination of its lending relationship with him for his downfall.

The DEBTOR testified that he was not present in his brother's law office on the date that VOSSOUGHI signed the warranty deed. He did not recall a conversation with his brother regarding the warranty deed, but he assumed that his brother was acting as his attorney. The DEBTOR testified that he never told Joseph to prepare the deed without the restriction. He did not review the deed before it was presented to VOSSOUGHI. The DEBTOR obtained a mortgage loan of $184,000 from American Bank and Trust. The HUD-1 Settlement Statement shows attorney fees being paid to Joseph's firm in the amount of

9

$1,250, with $500 being paid from the VOSSOUGHI'S funds and $750 being paid from PPM's funds.

*Analysis*

In order to afford the debtor a "fresh start," exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548 (7th Cir. 2000). The burden is on the creditor to establish each element of the exception to the dischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

*Section 523(a)(2)(A)*

VOSSOUGHI seeks a determination that the debt owed by the DEBTOR is nondischargeable pursuant to section 523(a)(2)(A). Section 523(a)(2) of the Bankruptcy Code provides as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by –
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). Excluded from the ambit of this provision are claims based on false pretenses, false representations or actual fraud which rest on a "statement respecting the debtors . . . financial condition." *Stelmokas v. Kodzius*, 2012 WL 313714 (7th Cir. 2012); *In re Cassel*, 322 B.R. 363, 374-75 (Bankr.C.D.Ill. 2005). A claim based on a statement concerning a debtor's financial condition must be brought pursuant to section 523(a)(2)(B), and as expressly provided by that section, such statements must be written.

Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses and false representation. A false representation is an express misrepresentation, either spoken or written. *In re Bowden*, 326 B.R. 62 (Bankr.E.D.Va. 2005). In contrast, "false pretenses" includes implied misrepresentations or any conduct intended to create and foster a false impression. *In re August*, 448 B.R. 331, 349 (Bankr.E.D.Pa. 2011). False pretenses has been defined as:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....
>
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Hanson*, 432 B.R. 758, 771 (Bankr.N.D.Ill. 2010) (quoting *In re Paneras*, 195 B.R. 395, 406 (Bankr.N.D.Ill. 1996).

To prevail on a claim of false pretenses or false representation, the creditor must prove that (1) the debtor made a false representation or omission to the creditor, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied. *Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010).

Actual fraud is recognized as encompassing "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quoting *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54

11

(Okla. 1952)). In order to establish that a debt was incurred by actual fraud, the creditor must show that (1) a fraud occurred, (2) the debtor intended to defraud the creditor and (3) the fraud created the debt. *Hanson*, 432 B.R. at 772.

Although the Seventh Circuit Court of Appeals has distinguished between the three separate grounds of section 523(a)(2)(A), essential to each is proof that the debtor acted with intent to deceive. *Id.* Intent to deceive is measured by the debtor's subjective intention at the time of the transaction by which the debtor obtained the money, property or services. *In re Burke*, 405 B.R. 626 (Bankr.N.D.Ill. 2009). Direct evidence of fraudulent intent is rarely present, but may be proved through circumstantial evidence or by inferences drawn from a course of conduct. *In re Logan*, 327 B.R. 907 (Bankr.N.D.Ill. 2005).

VOSSOUGHI'S second amended complaint pleads each of the three grounds for nondischargeability under section 523(a)(2)(A).[6] In that pleading, VOSSOUGHI describes the allegedly false representations to consist of oral assurances by the DEBTOR as to the success of his business interests and his financial stability. Those oral statements, concerning the DEBTOR'S "overall financial health" are not actionable under any part of section 523(a)(2).[7] *Stelmokas, supra.* VOSSOUGHI did not independently investigate the DEBTOR'S financial circumstances or request any financial statements from him, and in failing to do so, assumed the risk that his representations might not be true. At trial, no

---

[6] Count I of the second amended complaint alleges false pretenses; Count II alleges false representation; and Count III is based on actual fraud.

[7] While viewed individually, the complained-of representations may only relate to a single aspect of the DEBTOR'S financial picture, but the representations were made at the same time and were intended to collectively depict his financial well being. Given his desire to buy the business for cash rather than looking to the seller to finance the purchase over time, the DEBTOR did not have a clear motive to misrepresent his finances. But even if the DEBTOR was exaggerating his status as a financial heavy-hitter, that is precisely the kind of misrepresentation that is not actionable without a written financial statement.

12

evidence was offered of any specific representation made by the DEBTOR relating to the purchase of the gas station or the early pay off of the real estate contract which could serve as a basis for a claim under section 523(a)(2)(A).

In closing argument, VOSSOUGHI characterized his claim as one based on false pretenses. VOSSOUGHI maintains that the DEBTOR, acting in conjunction with his brother, deprived VOSSOUGHI of the benefit of the bargain that was struck between the parties at the close of their lengthy negotiations in September, 2008. VOSSOUGHI theorizes that because the deed failed to contain the bargained-for restriction upon resale, it must have been the DEBTOR'S intent all along to obtain free and clear title and thereby deprive VOSSOUGHI of the valuable real estate as security for the asset purchase and noncompete agreements.

VOSSOUGHI was represented by legal counsel of his own choosing, however, and the evidence is undisputed that the allocation of the purchase price between the three separate agreements was dictated by VOSSOUGHI'S accountant. Rather than obtain a mortgage on the real estate that secured all of the obligations, VOSSOUGHI, with the advice of counsel, utilized the concept of a restriction on sale, which would not have prevented the DEBTOR from mortgaging the property even if properly set forth in the deed.

VOSSOUGHI testified that he was amenable to the DEBTOR'S proposal to complete the contract early. VOSSOUGHI, on the advice of his own attorney, went to Joseph's office to execute the deed. The DEBTOR was not present and played no role in the closing. VOSSOUGHI testified that when he signed the deed he reminded Joseph of the restriction

in the Addendum and Joseph advised him that it would be added to the deed. At trial, Joseph did not recall having this conversation with VOSSOUGHI. Joseph denied that he personally prepared the deed, which he says was prepared by a staff member. He recalled greeting VOSSOUGHI that day, but says he then left the office and did not participate in the execution of the deed, which was handled by another employee.[8] The DEBTOR testified that he did not review the deed before it was signed, nor did he see the deed after it was signed. VOSSOUGHI had no contact with the DEBTOR during this time period. While the DEBTOR certainly knew that his brother was responsible for preparing the deed, there is no evidence of any communication from the DEBTOR to Joseph or his staff about the preparation or contents of the deed. VOSSOUGHI'S suspicion that the DEBTOR must have been acting behind the scene to ensure that the deed would be prepared, signed and recorded without the agreed upon restriction, while plausible in theory, is not supported by any evidence. While the DEBTOR clearly desired to obtain title to the real estate in order to use it to collateralize the loan from American Bank, there is no evidence he lied about that to VOSSOUGHI. Moreover, only sale of the property was restricted, not refinancing.

VOSSOUGHI argues that the inference can be drawn that because Joseph and the DEBTOR are brothers, they were in on a joint scheme to defraud him. No evidence supports this inference. Even if Joseph can be blamed for the absence of the restrictive language in the deed, no evidence was introduced that he omitted the restriction with an

---

[8]The Court is not making a determination or finding that Joseph is innocent of any misconduct. Since he was reminded at least by Meloy and perhaps by VOSSOUGHI that the deed needed to contain a restriction on sale, and he may have promised to attach an addendum to the deed, it is difficult to understand how the deed managed to get recorded with the restriction omitted. But Joseph is not on trial here and there was no evidence linking the DEBTOR to the omission.

14

intent to defraud VOSSOUGHI. An equally plausible inference is that it was omitted by mistake. Even if it was established that Joseph acted fraudulently, there was no evidence of any knowledge or complicity by the DEBTOR. Moreover, the restriction, by its terms, would have barred only resale of the property, not the conveyance of a mortgage. PPM's mortgage to American Bank did not violate the agreed upon restriction against resale.

Alternatively VOSSOUGHI contends that his debt is nondischargeable under section 523(a)(6), which makes nondischargeable a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In order to establish the nondischargeability of a debt under this provision, a creditor must prove the following three elements by a preponderance of the evidence (1) that the debtor intended to and caused an injury to the creditor's property interest; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious. Under the Supreme Court's decision in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), "willful" is defined to mean conduct intended to cause harm, not merely intentional conduct that results in an injury that was not intended. The term "malicious" involves acting in conscious disregard of one's duties or without just cause or excuse. *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). In essence, a willful and malicious injury is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act. *Jendusa-Nicolai v. Larsen,* --- F.3d ----, 2012 WL 1324245 (7th Cir. 2012).

Count IV of VOSSOUGHI'S second amended complaint incorporates the same allegations of misrepresentations and false pretenses, and recasts that same conduct as

15

causing a willful and malicious injury to his property. While some courts do not view section 523(a)(2)(A), which specifically excepts from discharge a debt involving misrepresentations, false pretenses or fraud, and section 523(a)(6) as mutually exclusive, claims based solely on oral statements respecting a debtor's financial condition, cannot find purchase in section 523(a)(6). *See In re Gulevsky*, 362 F.3d 961 (7th Cir. 2004); *see also In re Jahelka*, 442 B.R. 663 (Bankr.N.D.Ill. 2010) (a debt resulting from fraud is nondischargeable under section 523(a)(2) or not at all).

VOSSOUGHI also alleges that the DEBTOR'S actions in structuring the sale in a manner that would enable him to obtain unfettered title to the Oasis and leave VOSSOUGHI as an unsecured creditor were premeditated and undertaken with the intent to harm VOSSOUGHI. As set forth above, contrary to VOSSOUGHI'S contentions, the sale was not "orchestrated" by the DEBTOR, but structured in accordance with the directions of VOSSOUGHI'S accountant and with the advice and consent of his attorney. The evidence amply demonstrates that the DEBTOR entered into the purchase honestly, and in fact preferred to pay VOSSOUGHI in full at the outset. The evidence further established that the DEBTOR entrusted the matter of the early payoff of the real estate contract to his brother and was not present at the closing. No evidence was presented that the DEBTOR took or directed any actions regarding the deed, much less that he acted willfully and maliciously. Even if Joseph intended to injure VOSSOUGHI, his intent may not necessarily be imputed to the DEBTOR. *See Matter of Walker,* 726 F.2d 452, 454 (8th Cir. 1984). VOSSOUGHI has failed to prove his claims.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be

entered.

###